**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JMP SECURITIES LLP, | ) Case No. 11-4498 SC |
| | ) |
| Plaintiff, | ) ORDER DENYING DEFENDANT'S |
| | ) MOTION FOR JUDGMENT ON THE |
| v. | ) <u>PLEADINGS</u> |
| | ) |
| ALTAIR NANOTECHNOLOGIES INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

## I.  **INTRODUCTION**

This case presents a straightforward contract interpretation
dispute that has been substantially complicated by choice-of-law
issues.  Plaintiff JMP Securities Inc. ("JMP") is a financial
services firm.  Defendant Altair Nanotechnologies Inc. ("Altair"),
a Canadian corporation, provides advanced battery technology to the
renewable energy industry.  Altair hired JMP to serve as a
financial advisor.  The parties reduced their agreement to a
signed, written contract.  The contract provided JMP with a certain
fee if Altair was sold to or merged with another company, and with
another, higher fee if Altair received a "strategic investment."
The parties agree that Altair entered into a transaction covered by
the agreement, but they dispute whether the transaction was a sale
or a strategic investment, and hence whether Altair owes JMP the
higher or lower fee.

Complicating matters is the fact that the parties assume that some claims arising from their agreement, which contained a choice-of-law clause, are governed by the substantive law of New York while others are governed by the substantive law of California.  As explained in Section IV.A _infra_, that assumption is incorrect.  The Court, after undertaking a conflict-of-law analysis omitted by the parties themselves, concludes that the agreement is entirely governed by the substantive law of New York, with the possible exception of its attorney fee provisions.

Suing in diversity pursuant to 28 U.S.C. 1332, JMP brings four claims: (1) breach of contract, (2) promissory estoppel, (3) fraud, and (4) negligent misrepresentation.  ECF No. 1 ("Compl.").  Altair has moved for judgment on the pleadings, and the Motion has been fully briefed.  ECF Nos. 21 ("Mot."), 23 ("Opp'n"), 26 ("Reply").  Pursuant to Civil Local Rule 7-1(b), the Court determines that the Motion is suitable for determination without oral argument.  For the reasons set forth below, the Court DENIES Altair's motion for judgment on the pleadings.

## II.   __BACKGROUND__

In considering Altair's motion for judgment on the pleadings the Court takes as true all the well-pleaded allegations of JMP's complaint and reads them in the light most favorable to JMP.  Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc., 896 F.2d 1542, 1550 (9th Cir. 1990).  The Court also considers the exhibits JMP attached to its complaint.  United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003).

///

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

A.   **The Agreement**

1.   Fee Provisions

On July 8, 2010, JMP and Altair executed a written Agreement. Compl. ¶ 11; ECF No. 21 Ex. A ("Agr."). Under the terms of the Agreement, Altair engaged JMP's services as a financial advisor. Compl. ¶ 11.  The Agreement contemplated several kinds of business deals that Altair might undertake.  Id.  Two kinds are relevant here.  The Agreement contemplated that an outside party might buy or merge with Altair.  See id. ¶ 13.  It also contemplated that Altair might receive a "strategic investment."  Id. ¶ 14.

In either case, JMP would receive a fee for helping Altair conclude the transaction; the size of the fee would depend on the type of the deal.  Id. ¶ 15.  For a sale or merger, JMP would receive "a cash fee equal to [2 percent] of the consideration involved in the Sale or Merger, subject to a minimum fee of $750,000."  Id. ¶ 16 (quoting Agr. at 2).  The Agreement also included a "gross-up provision" that would apply if Altair effected only a partial sale or merger, so long as the transaction transferred control of Altair.  Id. ¶ 18 (quoting Agr. at 3).  The gross-up provision would calculate JMP's fee proportionate to the size of the stake in Altair acquired by the third party.  Id. Notably, the parties appear to have had a particular third party in mind: The Agreement provided JMP with a lower fee if Altair consummated a sale or merger "with Yintong Energy Company Limited ["Yintong"], its parent corporation, or its subsidiaries . . . ." Id. ¶ 17.  In such cases, the basis for JMP's fee would be 1.7 percent (the "Sales/Merger Fee") instead of 2 percent.  Id. ///

**United States District Court**
For the Northern District of California

1    The Agreement provided a comparable but separate fee structure

2    if Altair received a strategic investment.  In such cases, Altair

3    agreed to pay JMP "a cash fee equal to [6 percent] of the gross

4    proceeds of the placement . . . ."  Id. ¶ 19 (quoting Agr. at 2).

5    Again, Altair appeared to have its eye on Yintong: A strategic

6    investment by Yintong would entitle JMP to a fee of 4 percent (the

7    "Strategic Investment Fee") rather than 6 percent.  Id.

8             2.   Other Provisions: Indemnification, Integration,

9                  Choice of Law

10   The Agreement contained three other provisions relevant to the

11   instant motion.  First, it incorporated an attached Indemnification

12   Agreement.  Agr. Ex. A ("Indem. Agr.").  JMP alleges that the

13   Indemnification Agreement and certain other language in the

14   Agreement entitle it to recover attorney fees stemming from the

15   instant lawsuit.  Compl. ¶¶ 20-22, 44.  Second, the Agreement

16   contains an integration clause stating that the Agreement,

17   including the incorporated Indemnification Agreement, "contains the

18   entire agreement" between JMP and Altair.  Id. ¶ 23 (quoting Agr.

19   at 5).  The Agreement also provides, however, for amendment by a

20   "writing signed by the party against whom it is sought to be

21   enforced."  Id.  Third, the Agreement contains a choice-of-law

22   clause stating that the Agreement "shall be governed by and

23   construed in accordance with the internal laws of the State of New

24   York without giving effect to any principles of conflicts of law."

25   Id. ¶ 11; Agr. at 5.

26       **B.   The Transaction**

27   Around September 20, 2010, Altair entered into a share

28   subscription agreement with Canon Investment Holdings Limited

4

**United States District Court**
For the Northern District of California

1  ("Canon"), which operates through Yintong, its indirect and wholly

2  owned subsidiary.  Compl. ¶ 24.  Altair agreed to issue, and Canon

3  agreed to purchase, shares of common stock such that Canon would

4  own 51 percent of Altair.  Id.  On July 22, 2011, Altair and Energy

5  Storage Technology (China) Group Limited ("Energy Storage"), an

6  affiliate of Canon, executed an amended version of the share

7  subscription agreement (the "Transaction").  Id.  At the conclusion

8  of the Transaction, Energy Storage -- and thus, for purposes of the

9  Agreement, Yintong -- owned 53.3 percent of the outstanding common

10  shares of Altair, or 49.8 percent on a fully diluted basis.  Id.

11      **C.   JMP's Extrinsic Evidence**

12      JMP points to four pieces of extrinsic evidence which, it

13  asserts, establish that Altair knew the Transaction to be a

14  strategic investment rather than a sale or merger.

15          1.   Proxy Statement

16      JMP alleges that before executing the Agreement or concluding

17  the Transaction, JMP and Altair executives arrived at a "shared

18  understanding" that any transaction "in which proceeds are received

19  by Altair, as opposed to its shareholders, would be considered a

20  Strategic Investment for purposes of JMP's compensation."  Id. ¶¶

21  25-26.  According to JMP,  the parties publicly confirmed this

22  understanding in a Proxy Statement filed with the U.S. Securities

23  and Exchange Commission ("SEC") on November 15, 2010.  Id. ¶ 26

24  (citing id. Ex. B ("Proxy Stmt.")).  The Proxy Statement provides:

25  "Altair has agreed to pay [JMP] a transaction fee for its financial

26  advisory services equal to [4] percent of the transaction

27  consideration . . . ."  Proxy Stmt. at 26.  The 4 percent figure

28  accords with the Strategic Investment Fee.  The Proxy Statement

**United States District Court**
For the Northern District of California

also characterizes the negotiations between Canon and Altair which led up to the Transaction as having concerned "potential strategic investment . . . ." Id.

### 2. Fairness Opinion

The Proxy Statement incorporated a September 16, 2010 Fairness Opinion by JMP. Compl. ¶ 27 (quoting ECF No. 21-4 at 82-85 ("Fairness Op.")). JMP asserts that the Fairness Opinion further confirmed the parties' understanding of the Transaction as a strategic investment. The Fairness Opinion states that Altair told JMP the Transaction would be a "private placement." Id. JMP also alleges that when Altair asked JMP to prepare the Fairness Opinion, Altair did not ask JMP to address "transactions involving a merger or sale of assets . . . ." See id.

### 3. Conference Call Transcript

JMP cites a transcript of a conference call held September 20, 2010, the day after the Transaction. Id. Ex. C ("Conf. Call Trans."). On the call, Altair's President and Chief Executive Officer characterized the Transaction as a "nearly $48.9 million strategic investment in Altair." Id. ¶ 28 (citing Conf. Call Trans. at 2).

### 4. Slide Show Presentation Filed with SEC

JMP also points to a slide show presentation filed with the SEC on September 20, 2020. Id. Ex. D ("Slide Show"). One slide is titled: "Communication To Announce Strategic Investment In Altair." Id. ¶ 28 (quoting Slide Show at 3).

### D. Calculations Pertaining to JMP's Fee

JMP alleges that the gross proceeds from the Transaction were roughly $57.5 million. Id. ¶ 30. The Court notes that 1.7 percent

1  of $57.5 million is roughly $830,000.  With respect to its breach

2  of contract claim, JMP asserts three theories of recovery which,

3  JMP says, entitle it to recover more than $830,000.

4  　　　First, JMP asserts that the terms of the Agreement itself

5  obligate Altair to pay the 4 percent Strategic Investment Fee

6  rather than the 1.7 percent Sales/Merger Fee.  See id.  JMP alleges

7  that Altair has not paid either fee and therefore owes JMP, after

8  credit for certain other payments previously made, "at least

9  $2,150,430.16."  Id.

10  　　　Second, JMP argues in the alternative that the Proxy Statement

11  modified the Agreement and entitles JMP to the Strategic Investment

12  Fee (that is, the same figure previously alleged, approximately

13  $2.15 million).  See id. ¶¶ 32-34.

14  　　　Third, as a final alternative, JMP asserts that if the Court

15  ultimately deems the Transaction to have been a sale or merger, JMP

16  still would be "entitled to a fee calculated according to the

17  gross-up provision in the Agreement."  Id. ¶ 35.  JMP states that

18  under the gross-up provision Altair would owe it "at least

19  $1,813,218.51."  Id. ¶ 37.  The instant motion by Altair challenges

20  JMP's first two theories of contract recovery but not the third,

21  gross-up theory.  Mot. at 8 n.1.

22

23  **III. LEGAL STANDARD**

24  　　　"After the pleadings are closed -- but early enough not to

25  delay trial -- a party may move for judgment on the pleadings."

26  Fed. R. Civ. P. 12(c).  "Judgment on the pleadings is proper when

27  the moving party clearly establishes on the face of the pleadings

28  that no material issue of fact remains to be resolved and that it

**United States District Court**
For the Northern District of California

1  is entitled to judgment as a matter of law." <u>Hal Roach Studios</u>,

2  896 F.2d at 1550.  Moreover, a motion for judgment on the pleadings

3  is subject to the same standard of review as a motion to dismiss,

4  and thus the pleading must contain sufficient factual matter,

5  accepted as true, to state a claim to relief that is plausible on

6  its face.  <u>Johnson v. Rowley</u>, 569 F.3d 40, 44 (2d Cir. 2009); <u>see</u>

7  <u>also Cafasso, U.S. ex rel. v. General Dynamics C4 Systems, Inc.</u>,

8  637 F.3d 1047, 1055 n.4 (9th Cir. 2011) (citing <u>Johnson</u> with

9  approval).  A claim is plausible on its face when the plaintiff

10 pleads "factual content that allows the court to draw the

11 reasonable inference that the defendant is liable for the

12 misconduct alleged." <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949

13 (2009) (citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 556

14 (2007)).

15

16 **IV.  <u>DISCUSSION</u>**

17     **A.  <u>Choice of Law</u>**

18     The presence of a choice-of-law clause in the Agreement and

19 colorable conflict-of-law issues in the parties' briefing requires

20 the Court to determine, before it addresses the claims on their

21 merits, which state's substantive law applies to each claim.  This

22 analysis unfolds in three steps.  <u>Huynh v. Chase Manhattan Bank</u>,

23 465 F.3d 992, 997 (9th Cir. 2006).  First, the Court must determine

24 which choice-of-law rules to apply.  <u>See</u> <u>id.</u>  This question turns

25 on the type of jurisdiction exercised by the Court.[1]  <u>Zicherman v.</u>

26 _____

27 [1] JMP suggests that parties can contract around federal conflict-of-law rules.  Opp'n at 14 n.7.  JMP cites no authority for this proposition and the Court's review has revealed none.  On the

28 contrary, the language, reasoning, and policy of <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496 (1941), and its progeny

United States District Court
For the Northern District of California

1    <u>Korean Air Lines Co., Ltd.</u>, 516 U.S. 217, 228-29 (1996).  In the

2    next step, the Court applies the correct choice-of-law rules to

3    determine which substantive law applies to each claim.  See <u>Huynh</u>,

4    465 F.3d at 997.  Only then may the Court proceed to the merits and

5    apply the correct substantive law.  See <u>id.</u>

6        The first question, which choice-of-law rules apply, is easily

7    resolved: "Federal courts sitting in diversity must apply the forum

8    state's choice of law rules to determine the controlling

9    substantive law."  <u>Fields v. Legacy Health Sys.</u>, 413 F.3d 943, 950

10

11   suggest that the opposite is true.  See, <u>e.g.</u>, <u>Day & Zimmermann,
     Inc. v. Challoner</u>, 423 U.S. 3, 4 (1975) (federal court sitting in
12   diversity "must" apply conflict-of-law rules of the forum state),
     <u>Ledesma v. Jack Stewart Produce, Inc.</u>, 816 F.2d 482, 484 (9th Cir.
13   1987) (same mandatory language); <u>Abogados v. AT&T, Inc.</u>, 223 F.3d
     932, 934 (9th Cir. 2000) (same); <u>Kohlrautz v. Oilmen Particip.
14   Corp.</u>, 441 F.3d 827, 833 (9th Cir. 2006) (same).  A federal court's
     selection of the proper body of choice-of-law rules turns on the
15   type of subject-matter jurisdiction that the court is exercising.
     See, <u>e.g.</u>, <u>Patton v. Cox</u>, 276 F.3d 493, 495 (9th Cir. 2002) ("When
16   a federal court sits in diversity, it must look to the forum
     state's choice of law rules to determine the controlling
17   substantive law."); <u>Chan v. Soc'y Expeditions, Inc.</u>, 123 F.3d 1287,
     1297 (9th Cir. 1997) ("Federal common law applies to choice-of-law
18   determinations in cases based on federal question jurisdiction . .
     . ."); <u>Paracor Fin., Inc. v. Gen. Elec. Capital Corp.</u>, 96 F.3d
19   1151, 1164 (9th Cir. 1996) ("In a federal question action where the
     federal court is exercising supplemental jurisdiction over state
20   claims, the federal court applies the choice-of-law rules of the
     forum state . . . ."); <u>Aqua-Marine Constructors, Inc. v. Banks</u>, 110
21   F.3d 663, 670 (9th Cir. 1997) ("[A] federal court sitting in
     admiralty must apply federal maritime choice-of-law rules.").  This
22   suggests that a federal court cannot give effect to a contractual
     provision that purports to strip it of its ability to select the
23   right choice-of-law rules, insofar as that choice is jurisdictional
     in nature.  Moreover, the principle espoused by JMP risks reducing
24   the federal courts to a taxpayer-funded version of private
     arbitration, in which the parties may contract for whatever rules
25   of decision or procedure they wish.  The Court accordingly has
     grave reservations about JMP's position.  Ultimately, however, the
26   Court need not decide the issue it raises because, as explained
     below, California's choice-of-law rules result in the application
27   of New York substantive law to all four of JMP's claims -- which is
     the result that JMP says it achieved through its conflicts-of-law
28   clause.  Because the point is moot, the Court declines to decide
     it.

**United States District Court**
For the Northern District of California

1   (9th Cir. 2005) (quotation omitted).  Because this Court is sitting

2   in diversity in California, it must apply California's choice-of-

3   law rules.  The next question is, under California's choice-of-law

4   rules, which state's substantive law applies to each claim.

5          1.   <u>The Nedlloyd Test</u>

6          The Agreement includes a choice-of-law clause selecting the

7   substantive law of New York state.  Agr. at 5.  This clause is the

8   beginning, not the end, of the discussion about what substantive

9   law applies.  When parties to a contract bargain for an explicit

10  choice-of-law provision, courts applying California's choice-of-law

11  rules follow <u>Nedlloyd Lines B.V. v. Superior Court</u>, 3 Cal. 4th 459

12  (Cal. 1992).[2]  In that case, the California Supreme Court explained

13  that "the proper approach under [California's choice-of-law rules]

14  is for the court first to determine either: (1) whether the chosen

15  state has a substantial relationship to the parties or their

16  transaction, or (2) whether there is any other reasonable basis for

17  the parties' choice of law."  <u>Id.</u> at 466.  Usually, parties address

18  themselves only to the first, "substantial relationship" prong of

19  this test, and satisfy it, if at all, by establishing that one of

20  the parties is a citizen of, or has their principal place of

21  business within, the jurisdiction whose substantive law they have

22  chosen.  <u>E.g.</u>, <u>Ruiz v. Affinity Logistics Corp.</u>, --- F.3d ---, No.

23  _____

24  [2] The Court must "explicitly apply" these rules.  <u>Hoffman v.
    Citibank (South Dakota), N.A.</u>, 546 F.3d 1078, 1083 (9th Cir. 2008);

25  <u>see also</u> <u>ABF Capital Corp. v. Grove Props. Co.</u>, 126 Cal. App. 4th
    204, 215 (Cal. Ct. App. 2005) (requiring courts applying

26  California's choice-of-law rules to "include all the relevant steps
    in [their] analysis" and criticizing courts who "simply pass[]

27  over" the analysis).  The Court therefore adopts a skeptical
    posture toward counsel's assurances that no conflict-of-law issues

28  are presented here.

United States District Court
For the Northern District of California

10-55581, 2012 WL 388171, at *3 (9th Cir. Feb. 8, 2012)
(substantial relationship found where parties chose Georgia state
law and one party was incorporated and had its principal place of
business in Georgia); <u>Hatfield v. Halifax PLC</u>, 564 F.3d 1177, 1183
(9th Cir. 2009) (English law applied where one party was
incorporated in United Kingdom).  Some courts appear to blur the
line between the two prongs by equating a "reasonable basis" with a
"substantial relationship."  <u>See</u>, <u>e.g.</u>, <u>Expansion Pointe Props.</u>
<u>Ltd. P'ship v. Procopio, Cory, Hargreaves & Savitch, LLP</u>, 152 Cal.
App. 4th 42, 59 (Cal. Ct. App. 2007).

 This case, however, illustrates a distinct application of
<u>Nedlloyd</u>'s separate "reasonable basis" test.  Neither JMP nor
Altair is incorporated in New York or has its principal place of
business in New York.[3]  Neither party, then, satisfies the
substantial relationship test as it is usually applied.
Nevertheless, the Court concludes under <u>Nedlloyd</u>'s second prong
that there is a "reasonable basis" for applying New York
substantive law here because the Agreement contains a forum
selection clause in which both parties consented to "personal
jurisdiction and exclusive venue in the federal or state courts
located in either San Francisco, California, or New York, New York
. . . ."  Agr. at 5.  Applying New York substantive law serves to
protect the parties' legitimate expectation that a New York state
court -- or for that matter a federal court sitting in diversity in
California -- would apply the parties' chosen law.

---

[3] Altair is a Canadian corporation with its principal place of
business in Reno, Nevada, and JMP is a Delaware corporation with
its principal place of business in San Francisco, California.
Compl. ¶¶ 1-2.

**United States District Court**
For the Northern District of California

Having found that <u>Nedlloyd</u>'s reasonable basis test is met
here, "the court must next determine whether the chosen state's law
is contrary to a <u>fundamental</u> policy of California." <u>Nedlloyd</u>, 3
Cal. 4th at 466 (emphasis in original).  The parties raise one
colorable issue in this regard: the conflict between New York and
California law regarding reciprocity of contractual attorney fee
provisions.  JMP claims that the Agreement entitles it to attorney
fees.  <u>See</u> Section II.A.2 <u>supra</u>; Compl. ¶¶ 20-22, 44.  Altair,
citing New York substantive law, disagrees: It argues that the
Agreement provides indemnification for attorney fees only in the
context of third-party claims, not claims between JMP and Altair
themselves.[4]  Mot. at 13-16.  But, Altair says, even if the
Agreement did entitle JMP to attorney fees in this case,
"California law would make the provision reciprocal under
California Civil Code section 1717(a)."  <u>Id.</u> at 16 n.4 (citing <u>ABF</u>
<u>Capital</u>, 126 Cal. App. 4th at 214 (California statute requiring
reciprocity of attorney fee provisions "reflects a fundamental

---

[4] Altair assures the Court that "[b]ecause the Agreement does not
include a unilateral attorneys' fee provision covering litigation
between the contractual parties, no conflict with California law is
presented," and then proceeds to argue how the attorney fee issue
would come out if, hypothetically, a conflict <u>were</u> presented.  Mot.
at 16 n.4.  The Court, first, disagrees with Altair's assurance,
and second, the Court will not entertain a hypothetical dispute.
It is apparent that New York and California law differ in their
treatment of attorney fee reciprocity.  Indeed, Altair is the one
who brings up the difference.  It is equally apparent that the
Court must ascertain which body of law applies before applying it.
The Court takes Altair's discussion of attorney fee reciprocity to
be a shot fired across JMP's bow, warning JMP that those who live
by attorney fees may die by them too.  What Altair appears not to
realize is that by firing that shot, it also invited this Court to
decide an issue using a rule of decision not properly before it --
that is, to render an advisory opinion.  The Court may not and will
not do that.  <u>Golden v. Zwickler</u>, 394 U.S. 103, 108 (1969).  The
parties are responsible for ascertaining what the proper
substantive law is and placing it before the Court for decision.

1  policy of this state")).

2      JMP responds that California law is inapplicable because the

3  parties agreed to be governed by New York law "without giving

4  effect to any principles of conflicts of law."  Opp'n at 14 n.7

5  (quoting Agr. at 5).  As explained in footnote 1 supra, the Court

6  is highly skeptical of JMP's position.  But neither can the Court

7  uncritically accept Altair's position, because Altair assumes that

8  a conflict between the parties' chosen law and a fundamental policy

9  of California law ends the discussion.  It does not:

> If, however, there is a fundamental conflict with
> California law, the court must then determine whether
> California has a "materially greater interest than the
> chosen state in the determination of the particular issue
> . . . ."  [Citation.]  If California has a materially
> greater interest than the chosen state, the choice of law
> shall not be enforced, for the obvious reason that in
> such circumstance we will decline to enforce a law
> contrary to this state's fundamental policy.

16  Nedlloyd, 3 Cal. 4th at 466.  Altair disregards this final step of

17  the Nedlloyd analysis.  Consequently, the Court cannot determine

18  which body of substantive law applies to the Agreement's attorney

19  fee provisions.  The parties have assumed that New York law

20  controls, but it could be that California has a materially greater

21  interest than New York in having its law applied here.  If so, the

22  Agreement's choice-of-law clause would be unenforceable with

23  respect to JMP's claim for attorney fees and the Court would apply

24  California rather than New York law.

25      The parties have not briefed this issue and the Court will not

26  do it for them.  Altair bears the burden of showing that the

27  applicable substantive law entitles it to judgment on the face of

28  the pleadings.  Because Altair has not taken the requisite

United States District Court
For the Northern District of California

preliminary step of ascertaining which substantive law applies,
Altair has not carried its burden.  Therefore, with respect to
JMP's breach of contract claim for attorney fees, Altair's motion
for judgment on the pleadings is DENIED.

                2.   <u>Scope of Choice-of-Law Clause</u>

      Having disposed of the one conflict of law raised by the
parties, the Court still must address another question raised by
the briefs: which of JMP's four claims are covered by the
Agreement's choice-of-law clause.[5]  As the Court has already
explained, this question is controlled by California's choice-of-
law rules, not, as Altair asserts, New York substantive law, nor,
as JMP argues, the parties' contract.  In California,

> a valid choice-of-law clause, which provides that a
> specified body of law "governs" the "agreement" between
> the parties, encompasses all causes of action arising
> from or related to that agreement, regardless of how they
> are characterized, including tortious breaches of duties
> emanating from the agreement or the legal relationships
> it creates.

<u>Nedlloyd</u>, 3 Cal. 4th at 470.  All four of JMP's claims fit this
description.  The choice-of-law clause at issue here provides: "The
Agreement . . . shall be governed by and construed in accordance
with the internal laws of the State of New York without giving
effect to any principles of conflicts of law."  Agr. at 5.  JMP's
breach of contract and promissory estoppel claims both sound in

_____

[5] The parties briefed the breach of contract claim as if it were
governed by New York law (though, as the Court just discussed, they
disputed the effect of California law on attorney fees).  They
briefed the fraud and negligent misrepresentation claims as if
those were governed by California law (though that is, as explained
below, incorrect).  The parties appear to have "agreed to disagree"
about which substantive law applies to the promissory estoppel
claim (though the Court, of course, must ascertain and apply the
correct body of law to rule on the instant motion).

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1  contract[6] and clearly arise from and relate to the Agreement.

2  JMP's fraud and negligent misrepresentation claims assert "tortious

3  breaches of duties emanating from the agreement."  Therefore, under

4  California's choice-of-law rules, New York substantive law governs

5  all four claims, with the caveat discussed in Section IV.A.1

6  concerning attorney fees.  Altair, however, briefed its motion for

7  judgment on JMP's promissory estoppel, fraud, and negligent

8  misrepresentation claims using California substantive law.  Mot. at

9  16-23; Reply at 9-14.  JMP followed suit, defending these claims

10 using California substantive law.  Opp'n at 14-22.  In short, for

11 at least three of JMP's four claims, the parties failed to put the

12 proper rules of decision before the Court.

13      The Court is not inclined to fill in gaps in the parties'

14 briefing with any more independent research than it has already

15 conducted.  Altair bears the burden of showing that it is entitled

16 to judgment on the pleadings and, because it has failed to cite and

17 apply the correct law, it has not carried its burden.  Therefore,

18 the Court DENIES Altair's motion for judgment on the pleadings with

19 respect to JMP's claims for promissory estoppel, fraud, and

20 negligent misrepresentation.

21      **B.   Breach of Contract Under the Agreement**

22      The Court now proceeds to apply New York substantive law to

23 the remaining claims on which Altair has moved for judgment on the

24 pleadings: (1) JMP's claim that the Agreement itself obligates

25 _____

26 [6] Altair incorrectly suggests that promissory estoppel is a tort
    claim.  Promissory estoppel is a contract doctrine "which employs

27 equitable principles to satisfy the requirement that consideration
    must be given in exchange for the promise sought to be enforced."

28 Kajima/Ray Wilson v. Los Angeles Cnty. Metro. Transp. Auth., 23
    Cal. 4th 305, 310 (Cal. 2000).

1  Altair to pay the Strategic Investment Fee, and (2) in the

2  alternative, that the Proxy Statement modified the Agreement such

3  that Altair owes JMP the Strategic Investment Fee.

4           1.   <u>Breach of Contract Under the Agreement</u>

5       JMP's primary claim is that the Agreement entitles it to

6  receive from Altair the 4 percent fee triggered by a strategic

7  investment from Yintong.  JMP points to a variety of extrinsic

8  evidence which, it says, establishes that Altair and JMP understood

9  the Transaction to be a strategic investment rather than a sale or

10 merger.  Section II.C <u>supra</u>; Opp'n at 7-8.  JMP also observes that

11 "nothing in the Agreement addresses what fee provision applies in

12 the event that the Transaction falls within the definition of both

13 terms."  Opp'n at 8.  Altair responds that the Agreement is

14 unambiguous on its face and that JMP therefore may not introduce

15 extrinsic or parol evidence to vary its terms -- terms which,

16 Altair says, entitle JMP only to the Sale/Merger Fee.  Mot. at 9;

17 Reply at 3.

18      The Court disagrees with Altair.  Under New York law, contract

19 language is ambiguous if it "is capable of more than one meaning

20 when viewed objectively by a reasonably intelligent person who has

21 examined the context of the entire integrated agreement and who is

22 cognizant of the customs, practices, usages and terminology as

23 generally understood in the particular trade or business."  <u>Seiden</u>

24 <u>Assocs., Inc. v. ANC Holdings, Inc.</u>, 959 F.2d 425, 428 (2d Cir.

25 1992) (applying New York state law) (quotation marks and citations

26 omitted).  "Conversely, language is not ambiguous when it has a

27 definite and precise meaning, unattended by danger of misconception

28 in the purport of the contract itself, and concerning which there

is no reasonable basis for a difference in opinion."  <u>Id.</u>
(quotation marks and citations omitted).  Here, the Court has
examined the context of the entire integrated Agreement and still
discerns a reasonable basis for a difference in opinion.  As Altair
notes, the Agreement spells out a lengthy definition of "Sale or
Merger."  <u>See</u> Agr. at 1.  But while the Agreement may be clear as
to what constitutes a Sale or Merger, its definition of a Strategic
Investment is, to the extent that it is a definition at all,
circular.

The purported definition crops up in a sentence describing the
types of deals Altair might make.  <u>See id.</u>  This sentence, which
refers to Altair as "the Company," provides in pertinent part that
JMP's services "may lead to a sale or merger of the Company (a
'Sale or Merger') . . . or a strategic investment of Equity
Interests (defined below) of the Company by financial or strategic
investors (a 'Strategic Investment') . . . ."  <u>Id.</u>[7]  In other
words, a strategic investment is one made by a strategic investor.
That definition is not clear enough to establish by itself that the
Transaction was not a strategic investment, for the simple reason
that it does not explain what a strategic investment is other than
that it involves the acquisition of "Equity Interests."  It is
undisputed that Yintong through Canon purchased "Equity Interests"
in Altair.  Given that the Court must draw all reasonable
inferences in JMP's favor, the Court cannot say on the basis of the
Agreement alone that the Transaction clearly was not a Strategic

---

[7] The Agreement's definition of "Equity Interests" does not bear on
the question here.  The term means: "equity securities, rights,
warrants, or convertible debt or preferred equity securities or any
membership or partnership interests representing an interest in the
equity or net earnings of the Company . . . ."  Agr. at 1.

**United States District Court**
For the Northern District of California

1   Investment.  The Agreement is ambiguous in this regard.  And once
2   an "ambiguity is found, it must be resolved -- as well as all
3   inferences drawn -- against the moving party, which has the burden
4   of establishing that no facts material to the outcome of the
5   litigation are in dispute."  Seiden Assocs., 959 F.2d at 429.

6   　　　Moreover, the Court agrees with JMP that the Agreement
7   provides no guidance as to which fee applies when a transaction
8   falls within both its relatively specific definition of a "Sale or
9   Merger" and its amorphous description of a "Strategic Investment."
10  See Opp'n at 8-10.  Altair is correct that under the Agreement "a
11  transaction cannot simultaneously be both," Reply at 4, but of
12  course that does not prove which kind of deal the Transaction was.
13  The purported definition of "Strategic Investment" says nothing
14  except that such transactions involve the acquisition of "Equity
15  Interests" -- an activity which is wholly compatible with
16  investment, sale, or merger.  Altair argues that the more specific
17  language defining "Sale or Merger" should take precedence over the
18  more general description of "Strategic Investment."  Reply at 4.
19  But on the facts of this case such a reading would construe every
20  transfer of equity interests as a sale or merger, simply because it
21  is impossible to tell from the face of the Agreement what a
22  strategic investment is.  The parties clearly did not contemplate
23  this result and the Court respects their intent.

24  　　　Altair bears the burden of showing that the face of the
25  Agreement unambiguously denies JMP the relief it requests, and
26  Altair has not carried that burden.  Accordingly, the Court DENIES
27  Altair's motion for judgment on the pleadings with respect to JMP's
28  claim for breach of contract arising from the Agreement itself.

**United States District Court**
For the Northern District of California

2.   <u>Modification of the Agreement by the Proxy Statement</u>

JMP also brings an alternative breach of contract claim.  JMP asserts that if the Agreement alone does not establish that JMP is entitled to the Strategic Investment Fee, then the Proxy Statement modifies the Agreement so that it does.  <u>See</u> Compl. ¶¶ 25-26, 32-34, 43.  Altair argues that JMP has failed to plead the requisite elements of contract modification, which Altair identifies as offer, acceptance, consideration, and mutual assent.  Mot. at 12; Reply at 5.  JMP responds that New York permits modification without consideration if there is a signed writing, and that, in any event, the question of whether the Proxy Statement modified the Agreement is properly one for the trier of fact.  Opp'n at 11-12.

The Court agrees with JMP.  New York law requires a party asserting contract modification to allege all the usual elements of contract formation, that is, offer, acceptance, and consideration.  <u>Beacon Terminal Corp. v. Chemprene, Inc.</u>, 428 N.Y.S.2d 715, 718 (N.Y. App. Div. 1980).  But New York also has codified the general rule that consideration is not required if a purported modification is contained in a writing signed by the party against whom enforcement is sought.  N.Y. Gen. Oblig. Law § 5-1103 (McKinney 2010).  Here, the Proxy Statement is a writing and it was signed by Altair's president and chief executive officer.  Compl. ¶ 33.

As to offer and acceptance, there are not enough facts available to ascertain whether the Proxy Statement was itself an offer, an acceptance, the parties' reduction to writing of a previous agreement to modify, or none of the above.  The precise question at this stage of the case is whether Altair has established from the face of the pleadings alone that JMP not only

**United States District Court**
For the Northern District of California

1   has not, but cannot plausibly claim modification.  Altair has not

2   carried this burden.  JMP alleges the existence of negotiations in

3   which JMP stated, and Altair agreed, that the Transaction

4   constituted a strategic investment.  Id. ¶ 25.  JMP alleges that

5   these negotiations occurred "both before entering into the

6   [Agreement] and during the transaction with Canon . . . ."  Id.  It

7   is therefore unclear when and how, if at all, the parties offered

8   and agreed to modify the Agreement through the Proxy Statement.

9   This issue is properly one for the trier of fact.  And the mere

10  fact that the precise mechanics of the modification, if any, are as

11  yet unclear does not by itself make JMP's modification claim

12  implausible.  On the contrary, the Proxy Agreement says just what

13  one would expect if Altair did indeed regard itself as owing JMP

14  the 4 percent Strategic Investment Fee.

15      The Court DENIES Altair's motion for judgment on the pleadings

16  with respect to JMP's claim for breach of contract arising from the

17  Proxy Statement's purported modification of the Agreement.

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

## V.    CONCLUSION

For the foregoing reasons, the Court DENIES Altair's motion for judgment on the pleadings.  JMP's claims for breach of contract arising from the Agreement, from the Proxy Statement's purported modification of the Agreement, and from the Agreement's attorney fee provisions, remain undisturbed.  So does JMP's claim for breach of contract related to the gross-up provision, which Altair did not challenge.  Additionally, JMP's promissory estoppel, fraud, and negligent misrepresentation claims remain undisturbed.

IT IS SO ORDERED.

Dated: March 14, 2012

_____
UNITED STATES DISTRICT JUDGE